Filed 5/18/26  Animal Protection and Rescue League v. City of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| ANIMAL PROTECTION AND RESCUE LEAGUE, INC. et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF SAN DIEGO et al.,<br><br>Defendants and Respondents. | D085313<br><br>(Super. Ct. No. 37-2023-00048258-CU-BT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Pease & Ijadi and Bryan W. Pease for Plaintiffs and Appellants.

Heather Ferbert, City Attorney, M. Travis Phelps, Assistant City Attorney, and Chance C. Hawkins, Deputy City Attorney, for Defendants and Respondents.

Procopio Cory Hargreaves & Savitch, Kendra J. Hall, and Elaine F. Harwell, for Padres, L.P. as Amicus Curiae on behalf of Defendants and Respondents.

# I

## INTRODUCTION

Two animal welfare organizations, Animal Protection and Rescue League, Inc. and Showing Animals Respect and Kindness, Inc. (together, the petitioners), filed a complaint and petition for writ of mandate against the City of San Diego and San Diego Mayor Todd Gloria (together, the City) to stop the City from issuing an event permit to Padres, L.P. (the Padres) for an annual rodeo at Petco Park, a baseball park in downtown San Diego. The petitioners argued that health-and-sanitation provisions in the San Diego Municipal Code categorically prohibit cattle and horses from being brought into the urban area of the City encompassing Petco Park for a temporary entertainment event like the rodeo. The trial court rejected this argument and sustained the City's demurrer to the petition with prejudice.

On appeal from the judgment in favor of the City, the petitioners contend the court misconstrued the San Diego Municipal Code and therefore erred when it sustained the City's demurrer without leave to amend. We reject the petitioners' argument and conclude the San Diego Municipal Code allows cattle and horses in the area surrounding Petco Park for purposes of putting on a rodeo. Therefore, we affirm the judgment.

# II

## BACKGROUND

On November 2, 2023, the petitioners initiated this lawsuit by filing a complaint for declaratory and injunctive relief against the Padres, as well as C5 Rodeo MT, LLLP and C5 Rodeo Company, Inc. (together, C5 Rodeo). The petitioners alleged the Padres owned the San Diego Padres Major League Baseball team and were the lessees of Petco Park. According to the petitioners, the Padres planned to host a January 2024 rodeo at Petco Park,

2

which C5 Rodeo would operate. The petitioners averred the upcoming rodeo would violate several provisions of the San Diego Municipal Code that are not relevant to this appeal.

On August 5, 2024, after several rounds of demurrers and motions to strike, Petitioners filed the operative verified third amended complaint and petition for writ of mandate (hereafter, the petition) against the Padres, C5 Rodeo, and the City. The petitioners alleged the Padres had hosted the January 2024 rodeo at Petco Park and planned to continue hosting rodeos at the ballpark in the future.

The petition alleged the Padres and C5 Rodeo violated (and in the future would violate) San Diego Municipal Code sections 44.0307 and 44.0308 by bringing cattle and horses into Petco Park and housing them in private parking lots near the ballpark.[1] As we will discuss, section 44.0307 makes it unlawful to bring or maintain cattle and other specified animals within a non-agricultural zone of the City, while section 44.0308 makes it unlawful to bring or maintain a horse within the City unless it is kept in a corral, pasture, or stable that meets certain space and density requirements. Based on the claimed illegality of the rodeo, the petitioners sought: (1) a writ of mandate directing the City to deny the Padres event permits for future rodeos (Code Civ. Proc., § 1085), and (2) an injunction prohibiting the City from using and wasting taxpayer funds to support the rodeo (*id.*, § 526a).[2]

---

[1]  Further undesignated references to municipal code sections are to the San Diego Municipal Code.

[2]  The petition also alleged the Padres and C5 Rodeo violated the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) by committing acts of animal cruelty at the rodeo. Those allegations are not at issue in this appeal.

3

The City demurred to the petition. The City argued the petitioners' claims failed as a matter of law because sections 44.0307 and 44.0308 do not preclude cattle and horses from being temporarily brought into the area of the City encompassing Petco Park for the rodeo. Alternatively, the City argued the petition was not ripe for adjudication because it sought to regulate the City's permitting and spending authority related to future rodeos that had not yet been planned.

The trial court sustained the demurrer with prejudice, finding sections 44.0307 and 44.0308 applied to the long-term housing and maintenance of cattle and horses on farms or backyard stables, but not the use of cattle and horses during rodeos. The court reasoned that certain San Diego Municipal Code provisions, which we will discuss, expressly regulate rodeos within the City. According to the court, these provisions "demonstrate that the City Council intended to allow rodeos as a form of entertainment within City boundaries, but only as regulated."[3] After the court sustained the demurrer with prejudice, it entered judgment for the City.

III

DISCUSSION

The petitioners challenge the trial court's ruling sustaining the City's demurrer without leave to amend. They claim sections 44.0307 and 44.0308 prohibit bringing or maintaining horses and cattle in the dense urban area of the City encompassing Petco Park, even for the temporary purpose of putting on a rodeo. For reasons we shall explain, we disagree with the petitioners.

_____

[3] The trial court did not reach the City's alternative claim that the petition should be dismissed because it was not ripe for adjudication.

4

A. *Legal Standards*

The petitioners filed a petition for writ of traditional mandate (Code Civ. Proc., § 1085) and a cause of action for taxpayer waste (*id.*, § 526a) against the City.  Both claims rested on the petitioners' assertion that the annual Petco Park rodeo violates sections 44.0307 and 44.0308.

"A traditional writ of mandate will issue to 'compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station' [citation], 'where there is not a plain, speedy, and adequate remedy, in the ordinary course of law' [citation].  As relevant here, '[t]he writ will issue against a county, city or other public body or against a public officer.'  [Citation.]  'What is required to obtain writ relief is a showing by a petitioner of "(1) A clear, present and usually ministerial duty on the part of the respondent ... ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty." ' "  (*CV Amalgamated LLC v. City of Chula Vista* (2022) 82 Cal.App.5th 265, 278.)  According to the petitioners, the City has a ministerial duty to deny the Padres an event permit for the Petco Park rodeo because the rodeo violates the municipal code.

Code of Civil Procedure section 526a "creates a statutory taxpayer action against local governments.  The section has three main components.  First, it confers broad standing, authorizing any resident or corporation that pays or is assessed a tax that funds a local agency to sue the agency.  [Citations.]  Second, it has a substantive component: it prohibits 'illegal expenditure of, waste of, or injury to, the estate, funds, or other property' of the local agency.  [Citation.]  Third, it specifies the relief available: a judgment 'restraining and preventing' the prohibited expenditure, waste, or injury."  (*Mohler v. County of Santa Clara* (2023) 92 Cal.App.5th 418, 423, fn. omitted.)

5

As noted, the trial court sustained the City's demurrer to the petition with prejudice. " ' "The purpose of a demurrer is to test the sufficiency of a complaint by raising questions of law." ' " (*Frayo v. Martin* (2024) 102 Cal.App.5th 1025, 1032.) " 'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.' [Citation.] ' " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. ... We also consider matters which may be judicially noticed." ... Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' " ' " (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768.) When a trial court sustains a demurrer " 'without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse.' " (*County of Santa Clara v. Superior Court* (2023) 14 Cal.5th 1034, 1041.)

This appeal hinges on whether sections 44.0307 and 44.0308 allow cattle and horses in the area encompassing Petco Park for purposes of the rodeo. " 'We review disputes over the interpretation of a[n] … ordinance de novo. [Citation.] … When interpreting an ordinance, we apply the same rules of interpretation applicable to statutes. [Citation.]' [Citation.] 'Statutory construction begins with the plain, commonsense meaning of the words in the statute, " 'because it is generally the most reliable indicator of legislative intent and purpose.' " [Citation.] "When the language of a statute is clear, we need go no further." [Citation.]' [Citation.] If there is 'ambiguity, "[i]t is appropriate to consider evidence of the intent of the enacting body in addition to the words of the measure, and to examine the history and background of the provision, in an attempt to ascertain the most reasonable interpretation."

6

[Citation.] We may also consider extrinsic aids such as the ostensible objects to be achieved, the evils to be remedied, and public policy. [Citation.] When construing a statute, "our goal is ' "to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." ' " [Citation.]' [Citation.] [¶] In examining the language of the ordinance, 'we "apply common sense to the language at hand" and interpret a provision in a manner that makes "it workable and reasonable" and avoids an absurd result. [Citation.]' [Citation.] 'Moreover, we recognize that sometimes the meaning of a[n] [ordinance] is not properly determined from a word or phrase in a sentence; a literal construction should not prevail when it is contrary to the statute's intent.' " (*City of Santa Cruz v. Superior Court* (2024) 101 Cal.App.5th 475, 483–484.)

B. *Relevant Municipal Code Provisions*

Sections 44.0307 and 44.0308 are both codified in Chapter 4, Article 4, Division 3 of the municipal code. The City's expressed intent in enacting Chapter 4 ("Health and Sanitation") was to "provide minimum health standards for the City of San Diego." (§ 41.00.) Article 4 concerns "Nuisance – Powers of Health Officer," and defines a public nuisance as "[a]ny establishment or activity which is found by the Health Officer to be unsanitary or a menace to the public health or which is a violation of … Chapter [4] …." (§ 41.33.) Division 3 specifically regulates "Animals."[4]

The first of the two municipal code provisions at issue in this appeal, section 44.0307, subdivision (a), provides, "It is unlawful to bring or

---

4     Article 4, Chapter 4 includes five Divisions: "General Regulations" (Division 1), "Specific Regulations" (Division 2), "Animals" (Division 3), "Beekeeping" (Division 4), and "Public Swimming Pools" (Division 5).

maintain, within a non–agricultural zone within the City, any cattle, bovine animals, goats, or sheep." (§ 44.0307, subd. (a).)  Subdivision (b) carves out exceptions to this general prohibition.  It specifies that subdivision (a), does not apply to "[d]airies or dairy farms licensed during the month of July 1953," "[a]ny goats brought in temporarily, to privately-owned non-agricultural zones for the purpose of performing brush management," and "[t]he keeping of miniature goats on a premises zoned for a single dwelling unit or developed with a single dwelling unit," subject to various conditions that are not pertinent to the current appeal.  (§ 44.0307, subd. (b)(1)–(3).)

The second relevant provision, section 44.0308, states, "No person shall bring or maintain within the City any horse," unless the horse is kept in a corral, pasture, or stable satisfying certain space and density requirements. (§ 44.0308.)  In particular, a horse may be brought or maintained within the City only if "(a) the number of dwelling units within a one–fourth mile wide belt surrounding the corral, pasture or stable within which such horse is kept, is less than 300 units; and (b) 10,000 square feet of such stable, pasture area, or corral or combination thereof is provided for up to two (2) horses with an additional 5,000 square feet for each horse in excess of two (2); and (c) in the event more than four (4) horses are to be maintained, the permit therefor has authorized or has been amended to authorize the maintenance of such additional horses; and (d) no residence or dwelling exists except such as are owned, maintained or occupied by the owner of such horses within a 75 foot wide belt surrounding the stable, corral or pasture within which such horse is kept." (*Ibid.*)  Upon receipt of a notice from the County "that a horse is being kept in violation of part (a) of this section, … a holder of a permit under

8

Section 44.0301 … shall have a twelve (12) month grace period starting from the date of such notification in which to remove the horse or horses."[5] (*Ibid*.)

C. *Analysis*

Under traditional rules of statutory interpretation, we begin by examining the words of the statute or ordinance at issue to decipher its meaning. Section 44.0307 makes it unlawful for any person to "bring or maintain" cattle within any non-agricultural area of the City. Meanwhile, section 44.0308 makes it unlawful for any person to "bring or maintain" a horse within the City, unless the horse is "kept" in a corral, pasture, or stable that meets certain space and density requirements. The petitioners contend sections 44.0307 and 44.0308 unequivocally outlaw (either explicitly or by operation) the presence of cattle and horses in and around Petco Park for the rodeo. By contrast, the City and the Padres argue these regulations do not apply to the temporary presence of cattle and horses in and around Petco Park for the rodeo.[6]

Neither party provides us with dictionary or legal definitions of the words "bring" or "maintain." Merriam Webster's Dictionary defines "bring" as "to convey, lead, carry, or cause to come along with one toward the place

---

[5] Section 44.0301 provides, "No person shall bring or maintain within the City any domestic animals as defined in Section 44.0318 until or unless a permit therefor has been obtained from the Health Department, and such animals shall be kept in conformity with the requirements of this Division." Section 44.0318, in turn, defines a domestic animal as, "any horse, colt, mule, donkey, burro, ox, bull, cow, calf, hog, pig, sheep or standard goat."

[6] The Padres are not a party to the present appeal, but we granted them permission to file an *amicus curiae* brief on behalf of the City.

9

from which the action is being regarded."[7]  It defines "maintain" as, "to support or provide for," and "sustain."[8]  However, these dictionary definitions do not conclusively answer the central questions of whether section 44.0307 prohibits even the transient presence of cattle in a non-agricultural zone of the City, and whether the space and density requirements of section 44.0308 apply even when horses are temporarily present in the City, to participate in an entertainment event like the rodeo.  For reasons we shall explain, we conclude sections 44.0307 and 44.0308 do not apply in such circumstances.

As the trial court aptly observed, other municipal code provisions outside the chapter governing Health and Sanitation (Chapter 4) expressly contemplate that rodeos may take place within the City, subject to municipal regulation.  For example, section 33.0703 ("Permit Required"), a provision contained in Chapter 3 ("Business Regulations, Business Taxes, Permits and Licenses"), Article 3 ("Police Regulated Occupations and Business"), Division 7 ("Promoters"), states that "[i]t is unlawful to operate as a *promoter* without a *police permit*."  Section 33.0707 ("Exemptions"), a related provision in the same division, establishes an exemption for "[p]*romoters* of circuses, *rodeos*, carnivals and other similar events."  (Second italics added.)  This regulation demonstrates that the City Council regarded the rodeo as a

_____

7     Merriam-Webster's Online Dict. (2026) <https://www.merriam-webster.com/dictionary/bring, at par. 1a> [as of May 18, 2026], archived at <https://perma.cc/9MV5-EP79>.

8     Merriam-Webster's Online Dict. (2026) <https://www.merriam-webster.com/dictionary/maintain, at par. 4a & b> [as of May 18, 2026], archived at <https://perma.cc/EA2B-XKJK>.

permissible entertainment event within the City's borders (an event that does not even require a police permit).

Section 33.1620 ("Circus, Carnival, Rodeo — Regulated"), a provision in Chapter 3, Article 3, Division 16 ("Commercial Amusement Establishments and Assemblages and Devices"), presents another example.  The purpose and intent of Division 16 is to "regulate commercial amusement establishments," make commercial amusement establishment operators "responsible for patron conduct," and "make adequate provisions for security, crowd control and patron conduct," in light of the potential for "excessive noise generation and disorderly conduct by patrons, particularly at closing times, with an attendant adverse public safety impact on the surrounding business and residential community."  (§ 33.1600, subd. (a).)  With this purpose in mind, section 33.1620 provides, "It shall be unlawful for any person to conduct, operate or maintain any circus, carnival, *rodeo* or similar entertainment or exhibition at any single location or address in the City of San Diego without a permit, and for any period of time or periods of time in excess of a total of fifteen (15) days within any six (6) months period of time."  (Italics added.)

These provisions specifically contemplate that rodeos may take place within the City, subject to municipal regulation intended to minimize disruption to nearby businesses, residents, and patrons.  However, the petitioners' proposed reading of sections 44.0307 and 44.0308 stands in considerable tension with these provisions.  Under the petitioners' interpretation, sections 44.0307 and 44.0308 prohibit (either expressly or practically) any rodeo from taking place in vast swaths of the City, relegating them to the City's sparsely-populated and peripheral agricultural areas.  By contrast, the City's position more effectively harmonizes the municipal code's rodeo and health-and-sanitation provisions by allowing rodeos in areas other

11

than the City's agricultural outskirts, where regulations like section 33.1620 make the most sense to have in place. " 'We harmonize statutory provisions, if possible, giving each provision full effect.' " (*Stockton Citizens for Sensible Planning v. City of Stockton* (2012) 210 Cal.App.4th 1484, 1495.)

The language of section 44.0308 also supports the City's proposed interpretation of that provision. Section 44.0308 prohibits any person from bringing or maintaining a horse within the City unless the number and density of dwelling units "surrounding the corral, pasture or stable within which such horse is kept" is sufficiently limited. The regulation's reference to fixed structures and enclosures like corrals, pastures, or stables suggests the City Council intended the regulation to address the permanent and ongoing rearing of horses. Its use of the word "kept" similarly suggests the regulation applies when a person raises and maintains a horse within the City over an extended duration of time. (See *Butler v. City of Palos Verdes Estates* (2005) 135 Cal.App.4th 174, 183 ["The restriction stating that '[n]o cattle, hogs, or other animals, rabbits or poultry, may be kept' on one's property, construed in its ordinary and popular sense, means that the City, like any other property owner, may not *raise* peafowl on its property."], italics added.)

Even more significant, section 44.0308 includes a 12-month grace period for any permit holder that brings or maintains a horse within the City in violation of section 44.0308. This carve-out would essentially defang section 44.0308 in all cases involving the transient storage or transportation of horses. In our view, the regulation's inclusion of a 12-month grace period strongly suggests the City did not intend section 44.0308 to apply to the brief transportation or storage of horses within the City for temporary entertainment events like the rodeo.

12

Further, the petitioners' construction of the health-and-sanitation regulations would produce absurd and unreasonable consequences the City Council could not have intended when it enacted the regulations. As the Padres persuasively argue in their *amicus curiae* brief, the petitioners' interpretation would, in many circumstances, make it illegal simply to transport cattle within the City's non-agricultural zones to reach the City's agricultural zones or areas outside the City—no matter how fleeting their presence in the City's non-agricultural zones might be.[9] In practice, it could jeopardize common civic and law enforcement practices in which horses are used, like mounted patrols. And, if a person were found to have violated sections 44.0307 or 44.0308 while temporarily bringing or maintaining a bovine animal or horse within the City, even for a mere moment, the animal could be categorized a public nuisance and destroyed as a nuisance abatement measure—an outcome that all parties, especially the petitioners, would surely view as unreasonable and undesirable.[10] (§ 44.0304.)

---

[9] Section 44.0310 provides that Chapter 4, Article 4, Division 3 (the Division containing sections 44.0307 and 44.0308) does not apply to dead animals and animals that are in transit through the City for commercial abattoir (slaughterhouse) purposes.

[10] Section 44.0304, a provision codified in the same division as sections 44.0307 or 44.0308, states, "The bringing or maintenance within the City of any animals in contravention of this Division is, in addition to being a misdemeanor, hereby declared to be a public nuisance and the Director of Public Health or Director of Animal Control, is hereby authorized, directed and empowered to summarily abate any such public nuisance by any means reasonably necessary, including but not limited to the destruction of the animal or animals involved." (§ 44.0304.)

13

In arguing that the health-and-safety regulations forbid cattle and horses in and around Petco Park for the rodeo, the petitioners emphasize that section 44.0307 includes a carve-out that applies when "goats [are] brought in temporarily, to privately-owned non-agricultural zones for the purpose of performing brush management." (§ 44.0307, subd. (b)(2).) They claim this carve-out would be needless "surplusage" if section 44.0307 allowed the animals at issue to be brought temporarily into the City's non-agricultural zones. However, the drafters of the carve-out quite sensibly could have adopted a belt-and-suspenders approach and implemented the carve-out out of an abundance of caution, considering the ambiguous language of the regulation. "Moreover, 'like all … interpretive canons, the canon against surplusage is a guide to statutory interpretation and is not invariably controlling.' [Citations.] To the extent our interpretation results in some level of redundancy, we nonetheless believe it 'is more consistent with [the City Council's] intent than [the petitioners'] proposed reading." (*People v. Raybon* (2021) 11 Cal.5th 1056, 1070, fn. 10.)

For all these reasons, we conclude the trial court properly sustained the City's demurrer to the petition. Because the petitioners do not propose any amendments to salvage their petition, we also conclude the court properly denied the petitioners leave to amend.

IV

DISPOSITION

The judgment is affirmed. Respondents are entitled to their appellate costs.

McCONNELL, P. J.

WE CONCUR:

DO, J.

CASTILLO, J.